Angus BROWN, et al., Plaintiffs,

v.

Carl NEEB, et al., Defendants.

No. C 72–282.

United States District Court,
N. D. Ohio, W. D.

July 3, 1980.

Dale Wilker, Toledo, Ohio, for plaintiffs.

Robert G. Young, Asst. Director of Law, City of Toledo, Toledo, Ohio, for defendants.

## MEMORANDUM AND ORDER

DON J. YOUNG, District Judge:

This action filed August 18, 1972 involves problems of racial discrimination in the Fire Division of the City of Toledo, Ohio. After considerable work had been done on the case in preparation for resolution of the issues involved, a consent decree was entered on December 9, 1974. This decree is essentially identical to the consent decree in *Sarabia, et al., v. Duck, et al.,* Case No. C 72–263, which is quoted in the case of *Sarabia v. Toledo Police Patrolman's Association,* 601 F.2d 914, 915 (6th Cir. 1979), differing only in substituting "Fire Department" for "Toledo Police Department," and omitting in the third paragraph the words "and existing standards for police officers should not be lessened." The language in the bodies of the two decrees varies only to the extent made necessary by the fact that one decree deals with the Police Division and the other with the Fire Division of the City of Toledo.

The goal of reaching ratios of minorities in the Fire Division reasonably reflecting the ratio of each minority group to the total population of the City of Toledo had not been reached at the time the events giving rise to the present motions occurred. It is stipulated that as of March 23, 1980, out of a total force of 572 persons in the Fire Division, there were forty-seven (47) blacks, 8.21%, and seven (7) hispanics, or 1.22%. This contrasts with total population ratios of 14% and 1.9% respectively.

The evidence showed that from the beginning of the current calendar year, the City of Toledo has been suffering from severe financial problems. Tax revenues were running far below the projected amounts, but expenditures were not declining proportionately. It was estimated that if the present rates continued, the City

would incur a deficit of Three Million Seven Hundred Thousand Dollars ($3,700,000.00) by the end of the year. Ohio law forbids deficit operations by municipal corporations.

The City Manager, one of the defendants herein, has, in general, the authority and responsibility to deal with this problem. He determined that it should be solved by reducing the City's expenditures. Ultimately, with a few exceptions, noticeably that of the Police Division, the various Divisions were ordered by the defendant City Manager to reduce their expenditures by approximately seven percent (7%). It was left in the hands of each of the various Divisions to decide how to accomplish this in each Division, but in general, the operations of most of the Divisions are such that so substantial a reduction of expenditures could be accomplished only by laying off personnel. The problem of laying off personnel is complicated by the fact, among others, that various unions represent employees in different Divisions.

In actual dollars and cents, the Fire Division, with one of the largest budgets, suffered by far the greatest cut, being required to reduce its expenditures by Eight Hundred Thirty Thousand Dollars ($830,-000.00).

The defendant Neeb, as Chief of that Division, determined that to accomplish the necessary reduction in his budget the Fire Division would have to lay off sixty-one (61) employees. This would be accomplished by making the layoffs in order of seniority as established by the contract with the Fire Fighters Local Union 92 of the International Association of Fire Fighters, and also as required by the City ordinances. Accordingly, he ordered that the sixty-one (61) persons lowest on the seniority list be laid off effective at 7:00 o'clock A.M. on June 19, 1980.

Prior to that date, the plaintiffs filed a motion alleging that the impending reduction would lay off twenty-three black and hispanic fire fighters, leaving the ratios 4.69% black and 1.17% hispanic, or a total of 5.86%. There was some conflict in the evidence as to the exact ratios, the defendants claiming there to be 5.68% black and 0.78% hispanic, or a total of 6.46%. The difference does not appear to have any great significance.

The plaintiffs filed motions seeking both a temporary restraining order and a preliminary order of injunction restraining the defendants from making the proposed layoffs of minority fire fighters, and other relief. These motions were opposed by the defendants.

A hearing on the motion for a temporary restraining order was held on June 18, 1980. The motion was denied. A hearing on the motion for a preliminary injunction was held on June 23. This memorandum will serve as the Court's findings of fact and conclusions of law resulting from that hearing.

Fire Fighters Local Union 92 of the International Association of Fire Fighters filed a motion pursuant to Rule 24, Fed.R. Civ.P. for leave to intervene as a party defendant. The Court reserved its ruling upon the motion, but permitted counsel for the Local Union to participate fully in the preliminary injunction ruling. The Court does not find that the Local Union has established the elements permitting it to intervene as a matter of right. The Court will nevertheless grant its motion as a matter lying within the Court's discretion. An order will be entered accordingly.

Although there is a great deal of dispute and argument in this case, upon analysis the arguments appear to involve disagreements of law only. The basic facts which give rise to the disputes are simple, and quite clear. Very able counsel have done their best to put these facts in the light most favorable to their positions, and their best has been very good indeed. However, it is necessary to look coldly both upon what the facts are, and what this Court's jurisdiction and powers are, and to put the whole matter into a proper place in the whole structure of our system of law and government.

It is easy to avoid doing this by attempting to make careless or uncritical applications of certain decisions of the Sixth Circuit Court of Appeals and of the Supreme Court. To avoid doing so, it is necessary to go back to the consent order of December 13, 1974, entered after the case had been pending for well over two years.

Whatever the original complaint may have involved, and however vociferous counsel may be about what the parties would or would not have agreed to before the case was resolved, there can be no doubt that the plaintiffs commenced the action because they believed that there was employment discrimination existing in the Fire Division.

The consent decree states that "the City of Toledo is strongly committed to the concept of affirmative action to erase any vestiges of past employment discrimination within its municipal government." The decree then goes on to set up the mechanics of a program designed "so that within five (5) years from the date of this Order, the ratio of minority employment within the Fire Division reasonably reflects the ratio of each minority group to the total population of the City of Toledo."

In the light of this broad and express language, the repeated allusions of the defendants to this being a "hiring case" which has no application to discharges, lay-offs, or seniority systems is mere semantic quibbling. The decree is clearly and expressly designed to desegregate the Fire Division, and that is a purpose of sufficient scope to include a multitude of means and measures. Obviously, to the extent that it is impossible to change racial balance if no changes are made in hiring practices, this is a "hiring" case, but it is far more than that.

Nor was Title VII, the Equal Employment Opportunities Act, in any way involved in this case, either at its inception or presently. The case, and this Court's jurisdiction, rest squarely and firmly on §§ 1981 and 1983.

While paragraph 6 of the consent decree reserves a continuing jurisdiction in the Court to enter further orders appropriate to effectuate the provisions of the decree, the Court has that jurisdiction anyway. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1671 (6th Cir.) *cert. denied* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976).

The real problem in this case is not what this Court ordered to be done, or even the practical problems involved in the fact that the order had not yet been complied with when the present problem arose, but how far, and in what directions, should the Court go, or can the Court go, to enforce its order?

Obviously, neither practically nor in law does this Court have the jurisdiction or the power to order the City, or its officers, to increase taxes, or to spend its money in particular ways. The Court cannot determine the priorities that the City Council, or the City Manager, should establish for various activities. But by the same token, those entities cannot avoid complying with orders this Court had the power to make by saying that they will use mechanical processes such as "across-the-board reductions" or "neutral seniority systems" instead of deciding which things must be done regardless of cost, and which things must be foregone if there is not money enough to pay for everything.

The Constitution and Laws of the United States forbid racial discrimination. Under them, the parties agreed, and this Court ordered, that affirmative, that is, positive, action, was to be taken to erase "any vestiges of past employment discrimination" within the Fire Division. No matter how hard the times become, no matter what other activities of the City must be curtailed or eliminated, the defendants are required to press forward until the discrimination in the Fire Division has been eliminated.

With one minor exception, which was made much of at the hearing on the motion for a preliminary injunction, up until 7:00 o'clock A.M. on June 19, 1980, the defendants were attempting to bring themselves into compliance with their agreement and the Court's order. The ratio of minority

**4**

employment in the Fire Division was improving. The exception occurred in 1976, when the minority ratio fell 0.27% with the loss of one minority employee, a percentage decrease that was not overcome until sometime during 1978, although the actual number of minority employees did go above its previous level. This is so clear a case of "*de minimis non curat lex*" that this Court will not stultify itself by listening to defendants' claims that by not then seeking relief from the Court the plaintiffs have somehow waived or been estopped from exercising their right to object to the major setback that has occurred now.

In determining the methods they will use to solve the City's financial problems, the defendants have to accept certain matters as being impossible to change, as for example, the loss of a large amount of expected tax revenues. Another unchangeable fact is the order to eliminate discrimination in the Fire Division. So long as the defendants continue to move forward to the goal stated in the decree, they can expect that, in the absence of any showing of bad faith or forbidden activities on their part, the Court will withhold its hand and extend the time in which to attain full compliance. But the defendants cannot go backward, or even stand still. The decree required affirmative action, not negative action or even no action. In determining what methods the City will use to solve its financial problems, the defendants do not have, as an alternative, the right to increase the racial imbalance in the Fire Division.

The defendants make much in argument of the decision of the Sixth Circuit Court of Appeals in *Youngblood v. Dalzell*, 16 F.E.P. 361 (6th Cir. 1978). A superficial reading of this decision, which involved racial discrimination in the Fire Division of the City of Cincinnati would seem to require a judgment in favor of the defendants, but this Court does not read it so. In *Youngblood*, as in this case, there had been a consent decree. However, there was no agreement that the purpose of the decree was to eliminate past discrimination. Quite the contrary, it was vigorously asserted that there had been no pattern or practice of discrimi-

nation. The only thing the decree undertook to do was to increase the hiring of minority persons by the Division. After some progress had been made, the defendants undertook to lay off a considerable number of fire fighters, of whom almost half were minority members. The result of this was a substantial reduction in the percentage of minority members in the Fire Division. The plaintiffs sought to have the defendants punished for contempt of the consent decree. In its per curiam opinion the Court of Appeals affirmed the decision of the District Court that the defendants had not violated the consent decree because it dealt only with hiring, and had nothing to do with lay-offs. It pointed out that the lay-off was made on a seniority basis required by the Ohio statutes, statutes not referred to in the consent decree.

The consent decree here is couched in far different language, and as pointed out above, is not concerned entirely with hiring practices to overcome possible inferences of discrimination, but with eliminating existing discrimination in the Fire Division. Nor is this an action to find the defendants in contempt for violating the decree, but to enjoin them from refraining to perform it.

The *Youngblood* decision cannot be considered as applicable to the situation presented here, regardless of the close similarity of the factual situation in the two cases.

This case is much more like *Sarabia v. Toledo Police Patrolman Assn.*, 601 F.2d 914 (6th Cir. 1979), a case decided subsequently to *Youngblood*. As pointed out above, the consent decree involved in *Sarabia* is substantially identical in language to the decree in this case. In *Sarabia* the Court held that under the consent decree the District Court had authority to order the suspension of a civil service rule of the City of Toledo. The Court of Appeals held that:

"... the entire thrust of the decree is toward affirmative action to achieve 'a well-integrated department'."

601 F.2d at 918.

Much was made in argument of the supposed neutral effect of the seniority rule

embodied both in the intervening defendant Union's contract and the ordinances and statutes. It is obvious, of course, that however neutral the seniority rule may appear to be, its application had a tremendously disparate effect on the plaintiffs. The defendants rely on *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Arlington Heights v. Metropolitan Housing Development Corp.*, 492 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Quite apart from the fact that the problems presented in these cases have little or no resemblance to those of the instant case, in *Sarabia* the Court of Appeals expressly held the doctrine of these cases inapplicable, saying, "It is hard to understand how these decisions could be applied to a case involving a consent decree." 601 F.2d at 919.

The defendants, and particularly the intervening defendant, are particularly insistent that the lay-offs involved have been made under a bona fide seniority system, which would be compromised if the minority fire fighters were not laid off. In this they rely on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). This case holds that because of 42 U.S.C. 2000e–2(h) the routine application of a bona fide seniority system is not unlawful under Title VII. However, this case has never involved the provisions of that statute, but was brought under 42 U.S.C. §§ 1981 and 1983, the Civil Rights Acts of 1866 and 1871. In *Teamsters*, the Supreme Court recognizes that seniority systems may operate to freeze the status quo of prior discriminatory practices. 431 U.S. at 350, 97 S.Ct. at 1862. Here we are not dealing with seniority systems as such, or with Title VII at all, but with the carrying out of a consent order to eliminate vestiges of past discrimination. Obviously, anything that freezes the effects of past discrimination is forbidden by the order, and cannot be permitted, whatever excuse may be offered.

There are some other more technical matters that need to be addressed. The case is before the court at this time on a motion for a preliminary injunction. The extraordinary relief of a preliminary injunction ought not to be granted unless the party seeking it has established a reasonable likelihood of prevailing when the matter is heard upon the merits, that the harm to the asking party if the injunction is not granted outweighs the harm to the other party if it is, and that the asking party will suffer irreparable injury if immediate relief is not granted.

As to the first of these elements, as the Court has previously pointed out, the disputes in this matter are not essentially factual, but legal. It is highly doubtful that the evidence on final hearing will be much, if any, different than that which has already been offered. The Court has analyzed the legal disputes, and ruled favorably to the plaintiffs upon them. It therefore seems highly probable that the plaintiffs will prevail upon final hearing.

On the matter of the balancing of conveniences, the problem at this point is much different than it was when the Court refused a temporary restraining order, for such an order would last only a few days, and the probabilities of success on the merits were not weighed. To refuse a preliminary injunction, however, would bear much more harshly upon the plaintiffs and the law than granting it would weigh upon the defendants, who would only be put to the inconvenience of restudying the very numerous alternatives available to them for resolving the City's financial situation.

When the whole problem is looked at as a part of the operations of government in a constitutional manner, it seems clear to this Court that to permit the defendants to do what they have done would not only inflict irreparable injury upon the class of plaintiffs, but would ultimately damage the basic fabric of our whole system of liberty and equal justice under law.

If at the first breath of misfortune the government can jettison the protections against discrimination and equal treatment because those things stand in the way of taking simple and thoughtless palliative

measures for a temporary fiscal problem, our whole constitutional system is in jeopardy.

This case, and its companion case of *Sarabia v. Duck* have now been before this Court for about eight years. The consent decrees were entered because in spite of the careful professional efforts of skilled attorneys to avoid admitting that which could not truthfully be denied, there was no doubt that members of racial minorities were excluded from the Police and Fire Divisions.

When the consent decrees were entered, it was expected that no real problems would be encountered in recruiting minority policemen and fire fighters within the five year period. The records in the cases show how wrong those expectations were. The pious protestations of the decrees, and the good faith efforts of able counsel have been unable to overcome the vestiges of past discrimination that are really far less vestigial than anyone supposed. The history of these cases demonstrates the truth of the old adage that actions speak louder than words. The action that was taken effective June 19, 1980 in this case, if allowed to stand, will say more clearly than any amount of technical arguments and public relations campaigns that when the chips are down, the minorities will be deprived of their rights to non-discriminatory treatment in the Police and Fire Divisions whenever the City has to retrench financially. There is no doubt in this Court's mind that the plaintiffs will be irreparably injured, and that the goals of the consent orders in this case and in *Sarabia v. Duck* will never be attained if the lay-offs of June 19, 1980 are allowed to remain in effect.

This is not to say that the defendants may not make lay-offs in the Fire Division, or that no minority members of the Fire Division may be laid off when economic conditions require a reduction of personnel. The City Manager indicated that, in determining how to make the necessary reductions in the City's budget, he gave no consideration at all to this Court's order. His discretion does not give him the right to ignore a valid order which might limit that discretion to some extent.

This Court's order requires the defendants to act affirmatively to reach a stated goal. They may not, therefore, act negatively, or even neutrally. In any lay-offs in the Fire Division, no more minority members may be laid off than will leave the percentage ratios at figures no lower than they stood on March 23, 1980, that is, blacks 8.21% and hispanics 1.22% of the total number of authorized uniformed personnel.

During the course of the hearing, this Court reserved ruling on certain evidentiary matters. First, plaintiffs made a motion that the Court take judicial notice of Chapter 39 of the Toledo Municipal Code, dealing with the Hotel-Motel Tax. Defendants objected to this evidence on the ground that it was irrelevant. The Court reserved ruling. This Court will overrule plaintiff's motion. Second, this Court reserved ruling on the admissibility of defendant Union's Exhibit A, which was objected to by plaintiffs on the ground that it was not identified. This Court will overrule plaintiffs' objection and receive into evidence defendant Union's Exhibit A.

Therefore, for the reasons stated, good cause therefore appearing, it is

ORDERED, ADJUDGED, AND DECREED that the motion of the plaintiffs for a preliminary injunction shall be, and the same hereby is, SUSTAINED: and it is

FURTHER ORDERED that the defendants, and all persons acting in any relationship with them be, and they hereby are, enjoined from reducing, or permitting the reduction, of the number of minority uniformed personnel in the Fire Division below that number which will be in the following ratios to the total number of authorized uniformed personnel in said Fire Division, to-wit:

| | |
|---|---|
| Black | 8.21% |
| Hispanic | 1.22.% |

and it is

FURTHER ORDERED that defendants' motion to dismiss made at the close of plaintiffs' case be, and it hereby is, OVERRULED; and it is

FURTHER ORDERED that defendant Union's Exhibit A be received into evidence and that plaintiffs' motion requesting this Court to take judicial notice of Chapter 39 of the Toledo Municipal Code be, and it hereby is, OVERRULED; and it is

FURTHER ORDERED, that bond for this order be fixed in the sum of $100.00.

IT IS SO ORDERED.