James WHITE, Plaintiff-Appellee, Cross-Appellant,

v.

COLGAN ELECTRIC CO., INC., Defendant-Appellant, Cross-Appellee.

Nos. 84–3482, 84–3514.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 18, 1985.

Decided Jan. 29, 1986.

Joseph J. Allotta (argued), Larry D. Farley, Allotta, Singer & Farley Co., L.P.A.,

Toledo, Ohio, for defendant-appellant, cross-appellee.

Allan Scott Fisher (argued), Toledo, Ohio, E. Winther McCroom (argued), Youngstown, Ohio, for plaintiff-appellee, cross-appellant.

Before ENGEL, KEITH and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiff James White brought suit under Title VII, U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981, alleging racial employment discrimination. Defendant Colgan Electric Co. ("Colgan") appeals the District Court's finding of racial discrimination in the March 2, 1976, layoff of plaintiff James White. Mr. White cross appeals the District Court's grant of Colgan's motion for summary judgment on issues addressed and litigated in a previous employment discrimination class action suit, *Badgett v. IBEW*, 12 Fair Empl.Prac.Cas. 97 (N.D. Ohio 1975), *aff'd sub nom. Coggen v. IBEW*, 549 F.2d 800, 14 Fair Empl.Prac. Cas. 1047 (6th Cir.1977). Mr. White also appeals the District Court's holding that he was entitled to only $5,500 in damages and reasonable attorney's fees for the March 2 layoff because he had failed to mitigate his damages.

Mr. White began working as a trainee at Colgan in 1973, pursuant to a voluntary program in which Colgan attempted to increase the number of minorities in its work force. While Mr. White was not a union member, Colgan was able to hire him under the "48 hour clause," which allows an employer to hire off the street if the union cannot supply sufficient workers within forty-eight hours of an employer's request. A complete trainee program never materialized, but Mr. White remained at Colgan nevertheless until March of 1976, transferring from job to job as Colgan's needs dictated. His job classification never rose above "pre-apprentice."

In 1975, Mr. White was a named plaintiff in *Badgett, supra,* a class action suit against various unions and employer associations alleging racially discriminatory patterns and practices in the Toledo electrical trade. The *Badgett* case was settled with an Affirmative Action Plan and Consent Order in December of that year. Mr. White initially agreed to a settlement, which included relief for him in the form of a position as a first-year apprentice and $10,000 in damages. He then filed objections to the settlement and refused to sign a release, contending among other things that his nearly three years at Colgan entitled him to a higher job ranking and more pay. His objections were overruled by the district court. The district court's decision was later affirmed by this Court in *Coggen, supra.*

Two weeks after Mr. White refused for a second time the offer of a first-year apprenticeship, he was laid off in a reduction of work force at Colgan. A total of forty-seven employees, forty-five of them non-minorities, were laid off, pursuant to a legitimate order by the general contractor. The inverse layoff procedure which Colgan followed meant that those with the least seniority were laid off first. Several employees with greater seniority than Mr. White's were also laid off. Colgan points out, however, that had Mr. White entered the apprenticeship program when offered, he would have been insulated from the March 2 layoff.

Colgan management advised Mr. White to report to the union hall for further employment. According to Colgan's collective bargaining agreement, it could not hire or rehire employees without a referral from the union, unless the forty-eight hour time period mentioned above had elapsed. At the union hall, Mr. White was told to sign a pad of paper and wait to be called. Testimony credited by the District Court indicates that he did wait, but that he was never called.[1] Virtually all the other em-

---

1. After the District Court's finding of liability on the part of the union, the union settled with and

obtained a release from Mr. White. Neither

ployees laid off on March 2 were rehired by Colgan within a short period of time.

The issues presented in this case are therefore 1) whether Mr. White's claim for individual relief from acts of discrimination alleged and litigated in the *Badgett* case are res judicata in the current action, 2) whether the District Court properly found that Colgan Electric Co. discriminated against Mr. White in laying him off on March 2, 1976, and not rehiring him, and 3) if so, whether the District Court properly found that Mr. White had failed to mitigate his damages after the layoff.

## I

In the instant case, Mr. White seeks relief as an individual for claims of discrimination raised in the *Badgett* case, contending that although he was a named plaintiff and sought individual relief, the judgment in that case was addressed to him only as a class representative, and not as an individual. The District Court held below that any claims that Mr. White raised regarding the subject matter of *Badgett* were res judicata, even though Mr. White refused the settlement offered him in that case.

■■■ According to the doctrine of res judicata, if the second action is upon the same cause as the former one, the judgment on the merits in the first case is an absolute bar to the subsequent action between the same parties, not only in respect to every matter which is actually offered, but also as to every ground of recovery which might have been presented. *Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927). The Affirmative Action Program and Consent Order was a final judgment on the merits in *Badgett*. Consent orders can constitute a final judgment of class-wide discrimination claims and will result in the application of res judicata to individual claims brought later by class members. *Dosier v. Miami Valley Broadcasting Co.*, 656 F.2d 1295 (9th Cir.1981); *Fowler v. Birmingham News Co.*, 608 F.2d 1055 (5th Cir.1979).

■■ Plaintiff relies on *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984), for the proposition that a plaintiff unsuccessful in a class action suit may later maintain suit for damages based on his individual claim of discrimination. The holding in *Cooper* is inapplicable in this case, however. In *Cooper*, the court in the class action suit had found no discrimination after considering the claims of the named plaintiffs. Certain class members later initiated a suit based on their own claims of discrimination, claims that had not been litigated in the class action suit. The Supreme Court held that those class members were not barred by res judicata from bringing their individual claims before the court.

The special status of named plaintiffs in class action employment discrimination suits is quite clear. In *General Telephone v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the Court pointed out that while the Equal Employment Opportunity Commissioner may sue to secure relief for groups of discriminatees without complying with the requirements of Fed.R. Civ.P. 23, "[a]n individual litigant seeking to maintain a class action under Title VII must meet 'the prerequisites of numerosity, commonality, typicality, and adequacy of representation' specified in Rule 23(a). [*General Telephone Co. of Northwest v. EEOC,*] 446 U.S. 318, 330 [100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980)]. These requirements effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.' [*Id.*]" 457 U.S. at 156, 102 S.Ct. at 2369. By necessity, therefore, as Mr. White was a named plaintiff in *Badgett*, his claims were addressed by the court in that action.

Furthermore, Mr. White filed objections to the final judgment in *Badgett*. The objections included the following statement: "[t]here is no assurance in the consent order as to the plaintiffs receiving any damages or back pay." The objections were

party has appealed on the issue of the union's   liability.

considered by the District Court and subsequently overruled. This Court affirmed that decision.

For the reasons stated above, the District Court properly granted summary judgment as to the alleged acts of discrimination that were raised in *Badgett*, based on the doctrine of res judicata.

## II

Turning to the question of Colgan's liability for the claims of discrimination which occurred after the *Badgett* suit, the Court holds as a preliminary matter that the District Court erred as a matter of law in holding that Colgan violated Title VII by laying Mr. White off and not rehiring him in 1976. The District Court's decision vis a vis Colgan hinges on an analysis that has been rejected by the Supreme Court in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).

The District Court found, following *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), that Mr. White had established a prima facie case of discrimination against Colgan in that Mr. White, a black man, was laid off rather than reassigned to another site, and upon his request for re-employment was directed to the union for referral. Citing Colgan's "post-lay-off requests for labor and concomitant work force increase, and the supposed committment [sic] to integrate its work force," the court held that it was more likely than not that Colgan's actions were based on impermissible considera-

tions. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

The court then held that Colgan had not rebutted the prima facie case against it, in that it failed to advance lawful reasons for its actions. Colgan had argued that the inverse layoff procedure and referral system dictated by its collective bargaining agreement required it to take the action it did regarding Mr. White. The District Court held that where goals have been established in a consent decree, "[n]o employment practice or seniority rule, however facially neutral, will excuse stopping or retreating."

However, in *Stotts, supra*, the Supreme Court held that where a consent decree is silent as to an existing seniority system, the decree cannot be construed to conflict with the seniority system. The Court stated, "[h]ad there been any intention to depart from the seniority plan in the event of layoffs or demotions, it is much more reasonable to believe that there would have been an express provision to that effect." 104 S.Ct. at 2586. The court below was in error, therefore, in holding that "no ... seniority rule" could constitute a valid reason for laying off Mr. White in view of the Consent Order.[2]

We hold therefore that Colgan's explanation for laying off Mr. White, conformity with the inverse layoff procedure dictated by the collective bargaining agreement, was a legitimate reason for its action. Any other finding would be clearly erroneous on this record. Nothing in the agreement or the Consent Order would allow Colgan to depart from the inverse layoff procedure in White's case.[3]

2. The dissent contends that we advance the "notion that Title VII absolutely forbids voluntary action by an employer to the detriment of the seniority rights of non-minority workers." This contention is wholly without basis on the facts of this case. Colgan, the employer, *did not* voluntarily undertake to retain Mr. White to the detriment of other, more senior, employees. Colgan laid off Mr. White in accordance with the provisions of its collective bargaining agreement. The District Court in essence precluded

Colgan from doing so, by imposing liability, just as the district court in *Stotts* had precluded the employer from doing so by injunction.

3. The dissent states that the record indicates that Colgan could have avoided laying off Mr. White without violating the labor contract. The dissent bases its conclusion on the testimony of witness Phillip Couture, Local 8's business manager at the time of the trial. Testifying about the collective bargaining agreement, Couture said, "If you have a special skill or if you're a

As for Colgan's failure to rehire Mr. White, the Consent Order itself mandated that Colgan follow the referral system set up by the union. As the union is not a party to this appeal, its liability as to the functioning of the referral system is not before us. However, it is clear from the Consent Order that Colgan's only responsibility regarding the referral system was to use it. All relevant mandates in the order are addressed to Local 8.

If Colgan had had knowledge that the referral system employed by the union was in fact operating in a discriminatory fashion to prevent Mr. White's rehiring, Colgan would have been under a duty at least to inquire at Local 8 as to Mr. White's availability for work. The record lacks evidence, however, that Colgan knew that the union referral system was discriminating against Mr. White, or that it even knew that Mr. White had actually reported to the union hall for a referral. The only reference in the record is Mr. White's statement that he thought that he had gone back to Colgan a couple of months after his layoff. There is no evidence that he informed Colgan that he had gone to the union for a referral and had been unable to obtain one.

On this record, there is insufficient evidence for a factfinder to conclude that Mr. White successfully proved that Colgan's proffered explanation as to its laying off and not rehiring Mr. White was pretextual. Any such finding by the District Court would therefore be clearly erroneous.

In light of the foregoing analysis, we hold that Colgan successfully rebutted Mr. White's prima facie case against his employer and that Mr. White did not prove that Colgan's proffered explanation was pretextual, the third stage of proof in a Title VII case. Mr. White did not meet his ultimate burden of persuasion that "a discriminatory reason more likely motivated the employer" or that "the employer's proffered explanation is unworthy of cre-

dence," *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095. Accordingly, the District Court's finding of liability on the part of Colgan is reversed. We therefore need not address the question of mitigation of damages.

The judgment of the District Court in favor of the plaintiff is reversed. The summary judgment in favor of Colgan is affirmed.

KEITH, Circuit Judge, concurring in part and dissenting in part.

I concur in Section 1 of the majority's opinion. I cannot, however, concur in the portion of the opinion pertaining to Colgan's liability for discrimination under Title VII. For the reasons set forth below, I respectfully dissent from Section II.

Today, a majority of our Court decides that a black employee cannot sustain a Title VII action against an employer who under the Collective Bargaining Agreement unnecessarily lays off a minority employee, in spite of voluntary affirmative action policies, and who failed to rehire the minority as a result of a discriminatory referral system. Accordingly, the majority holds that the district court erred as a matter of law in holding that Colgan violated Title VII by laying Mr. White off and not rehiring him in 1976 based on *Firefighter Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Since I do not share the majority's analysis in the instant case, I dissent from Section II of the majority's opinion.

**I.**

Although the majority briefly sets forth the facts and the district court's holding in this controversy, I believe that further amplification of both will help put this case in perspective.

minority or if you're a supervisor, something like that, you can avoid the inverse layoff procedure." Tr. 420–21. The contract does indeed include provisions for those with special skills and supervisors, but is silent as to minorities.

At another point in his testimony, Couture states that minorities are generally exempt from layoff on federally subsidized jobs. Tr. 416. There was no allegation that this job, the Davis-Besse nuclear power plant, was federally subsidized.

The district court sets forth the factual basis of its findings of fact and conclusions of law for its determination that both defendant, Colgan Electric Company and defendant, International Brotherhood of Electrical Workers, Local No. 8, hereinafter referred to as the "Union", intentionally discriminated against plaintiff White because of his race in violation of Title VII and 42 U.S.C. Section 1981.

To reach its decision, the district court had to review the parties' action, conduct, and behavior in relation to the related race discrimination case of *Badgett v. IBEW*, 12 F.E.P. 97 (N.D.Ohio 1975) aff'd sub nom *Coggen v. IBEW*, 549 F.2d 800, 14 F.E.P. 1047 (6th Cir.1977), both during, and subsequent to its pendency; and the proposed consent decree which was eventually entered by the district court. The court concluded that the defendants intentionally used otherwise legitimate procedures and systems as a pretext to perpetrate a sham and fraud upon plaintiff White and to circumvent the court decree thus, violating rights afforded plaintiff by the Civil Rights Acts of 1964 and 1866.

In order to fully understand the facts in the instant case, it is necessary to consider circumstances surrounding minority employment in the electrical construction industry prior to the *Badgett* claim, and plaintiff White's relation to Colgan. The *Badgett* consent decree recognized in its opening paragraph that there had been discrimination in employment in the industry in the past, and that it was necessary to ensure minority representation in the industry.

In its finding of fact, the district court found that, in order to forestall the inevitable filing of an action like *Badgett*, the Union and the Electrical Construction Industry Employer Organization, of which defendant Colgan was a member, voluntarily set up the electrical pre-apprenticeship trainee program for the purported purpose of providing minorities classroom training and work experience sufficient so that the "trainees" could qualify as electrical apprentices. James White was referred to Colgan on March 3, 1973 as an electrical trainee under the now defunct trainee program. This referral was pursuant to a voluntary affirmative action program, the Toledo Hometown Plan. The Toledo Hometown Plan was an agreement between the trade associations and the unions to develop an affirmative action program which would encourage equal employment opportunity for blacks and minorities in the electrical industry. The district court noted that, although plaintiff White was selected and employed by defendant Colgan as a trainee, he was never given any classroom training. After the filing of the *Badgett* suit, White was allowed to continue working as a "trainee" even though Colgan never developed a training program.

The district court observed that as a named plaintiff in *Badgett*, plaintiff White was offered a lump sum settlement and the privilege of entering the defendant's apprenticeship program as a first division, first-year apprentice at a lower salary than his present earnings. The court found that plaintiff White, believing that the award was inequitable, given his two and a half years with the company, refused to accept it. Plaintiff filed objections to the negotiated settlement offer and the consent decree and appealed the court's adverse decision.

The district court also observed that plaintiff White was laid off by Colgan on March 2, 1976 pursuant to the inverse layoff procedure under the Collective Bargaining Agreement; though, in the past, Colgan Electric Company had always transferred him to another project when one had been completed. The evidence revealed that nearly all of the laid off employees, except plaintiff, were rehired within a very short time after the layoff. Plaintiff White never regained employment with Colgan.

Although the provisions of the labor agreement required employers to fill job openings through the Union's hiring hall, the evidence adduced revealed that Colgan was able to initially employ plaintiff White as a minority trainee without Union referral, and that Colgan could have continued employing plaintiff without laying him off.

These procedures to retain minority employees as practiced by Colgan had not been found to violate the inverse layoff procedures of the Collective Bargaining Agreement in the past. The undisputed record indicates that if there was a minority requirement on a federally subsidized job, then the decision to lay off or retain a minority under such circumstances would be that of management. Moreover, the record indicates that if an employee had a special skill, was a minority, or a supervisor, he could avoid the inverse layoff procedure of the labor agreement.

The court also found that the Union never complied with the provisions of the consent decree requiring a referral register, and that no change was made in the job referral procedures after the entry of the decree. The court determined that after applying for re-employment with Colgan and being referred to the Union, plaintiff White went to the union hall and did everything required by the *Badgett* decree to obtain a referral. However, plaintiff was neither called nor referred. The evidence demonstrated and the court found that a notation following plaintiff's name on the yellow tablet page which stated plaintiff had refused to sign an application was an attempt by the defendants at some later time to excuse their failure to refer the plaintiff for employment. It also found that the *Badgett* consent decree did not require persons seeking employment referral by the Union to sign an application.

The evidence further demonstrated that the percentage of employment of blacks among Colgan's work force increased markedly while the *Badgett* action was pending, but decreased dramatically in the months following the entry of the consent decree so that it was at a low level in July when Colgan's employment level was at its peak. Although the consent decree was addressed to the Union, it was voluntarily adopted by Colgan.

Consequently, after reviewing and analyzing the facts of this case including the supposed commitment by the defendants to integrate the industry, the district court concluded that the defendants purposely and intentionally discriminated against plaintiff White on the basis of his race.

## II.

Given this background and the specific findings of the trial court, I believe the majority's holding is flawed in two respects. First, the majority states that under *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), where a consent decree is silent as to an existing seniority system, the decree cannot be construed to conflict with the seniority system. Thus, the majority holds that since the consent decree here was silent as to the existing seniority system, Colgan did not violate Title VII by laying off Mr. White. I disagree because the facts and rationale of *Stotts* are inapplicable to the instant case. Second, the majority holds that Colgan rebutted White's prima facie case and that White failed to prove Colgan's explanation was pretextual. Again, I disagree because the correct standard of review for findings of discrimination is the clearly erroneous standard, which the majority fails to apply. *See Taylor and Gaskin, Inc. v. Chris-Craft Industries*, 732 F.2d 1273 (6th Cir.1984).

## A.

The central issue in *Stotts* arose from a controversy over which employees would first be laid off from employment in the Memphis Fire Department. A prior consent decree between the City of Memphis and the United States had instituted a plan to remedy past discrimination by setting goals for the hiring and promotion of minorities. *See id.*, 104 S.Ct. at 2581. Due to a "budgetary shortfall," *id.*, the City of Memphis was forced to lay off personnel in many of its departments, including the Fire Department. The City announced its intention to lay off employees on a "last hired, first fired" basis in accordance with the City's seniority system. *Id.* at 2581–82. The district court enjoined the City from doing so. The Supreme Court succinctly stated the issue in *Stotts* as "whether the

District Court exceeded its powers in entering an injunction requiring white employees to be laid off, when the otherwise applicable seniority system would have called for the layoff of black employees with less seniority." *Id.* at 2585 (footnotes omitted).

The Supreme Court held that when fashioning relief for a violation of Title VII, a court was limited to making whole those victims of past discrimination. Relief thus could not be given based merely on membership in the disadvantaged class. The Court specifically left open the question of whether the employer could, without violating Title VII, voluntarily adopt an affirmative action program offering benefits based on membership in the disadvantaged class. 104 S.Ct. at 2590. *See Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 489 (6th Cir.1985).

The most significant factor distinguishing this case from *Stotts* is that the affirmative action plan and the consent decree here were voluntarily entered into by the parties. In *Stotts,* the city strenuously objected to the modified decree. *Stotts* therefore dealt with a decree which is essentially coercive to the defendant and consensual in name only. Here, unlike *Stotts,* the Union and Electrical Construction Industry Employer Association, of which defendant Colgan was a member, voluntarily set up the electrical pre-apprentice trainee program for the purpose of providing classroom training and work experience sufficient so that the trainees could qualify as electrical apprentices. Plaintiff White was one of

three minorities hired under this affirmative action program. Moreover, the district court held that in order to forestall the inevitable filing of a discrimination action Colgan voluntarily adopted the consent decree in *Badgett.* Although plaintiff filed an objection, the present decree reflects voluntary action on the part of a private defendant and must be analyzed as a voluntary case involving private affirmative action. *See Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479 (6th Cir.1985).

The above distinction makes the legal reasoning of *Stotts* inapplicable. *Stotts* relied on Section 706(g) of Title VII which provides that "[n]o order of the court shall require the ... promotion of an individual ... if such individual was refused ... advancement ... for any reason other than discrimination." [1] In my view, Section 706(g) merely limits the power of a court to order certain remedies under Title VII in the absence of a finding that the promoted individual was a victim of discrimination. The provision does not limit the remedies in situations where an individual is found to be the victim of discrimination and where the parties voluntarily agree to implement affirmative action under a consent judgment. *See Vanguards of City of Cleveland v. City of Cleveland,* 753 F.2d 479, 487–88 (6th Cir.1985). The Supreme Court recognized that cases like this are different from *Stotts* when it stated:

> [T]he Court of Appeals was of the view that the District Court ordered no more than that which the City unilaterally

---

1. Section 706(g) provides in full:
   If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a

charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of Section 2000e–3(a) of this title.
*See* 42 U.S.C. § 2000e–5(g).

could have done by way of adopting an affirmative action program. Whether the City, a public employer, could have taken this course without violating the law is an issue we need not decide. The fact is that in this case the City took no such action and that the modification of the decree was imposed over its objection.

*Stotts*, 104 S.Ct. at 2590.

Section 703(h) provides, in part, that it shall not be an unlawful employment practice for an employer to differentiate between employees on the basis of a "bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production."[2] It does not state that an employer is required to make such differentiations. In short, an employer does not, by the mere force of § 703(h), violate Title VII by failing to adhere to the procedures permitted by that section.

Although Colgan did not order the March 2, 1976 layoff, it could have in accordance with the provisions of the labor agreement and the accepted practices in the trade, avoided the layoff of Mr. White. The record clearly establishes that if there was a minority requirement on a federally subsidized job, then the decision to lay off or retain a minority under such circumstances would be that of management. Moreover, the record indicates that if an employee had a special skill, was a minority, or a supervisor, he could avoid the inverse layoff procedure of the labor agreement. Since the employer was not required to make seniority distinctions under § 703(h), and since the record indicates that Colgan

could have avoided laying off White without being in violation of the labor agreement, I do not believe the district court's holding is contrary to *Stotts*.

Stotts is further distinguishable in that, the district court in *Stotts* did not find that any of the black employees protected from layoff had been a victim of discrimination. *Stotts*, 104 S.Ct. at 2588. Here, the district court expressly found that Mr. White was a victim of discrimination. Specifically, the court found that White was never given any classroom training while he was a pre-apprentice in the affirmative action program, that he was permitted to languish without promotion or termination; that under its affirmative action policies, Colgan could have avoided White's layoff without violating the labor agreement; that provisions of the referral system were not only applied in a discriminatory fashion but also never complied with, and that Colgan's "post-layoff requests for labor and concomitant work force increase, and the supposed commitment (sic) to integrate its work force" was based more likely than not on impermissible considerations. The district court also found that Colgan "apparently adopted the consent decree in *Badgett*, not to help them do what the law required them to do, but as a window dressing under cover of which to continue past discriminatory practices." Thus, the district court held that Colgan never intended to stop discriminating on the basis of race in their layoff procedure.

*Stotts* must also be read in light of *United Steelworkers of America, AFL–CIO–*

---

**2.** Section 703(h) reads in full:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences [sic] are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to

act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of Section 206(d) of Title 29.

*See* 42 U.S.C. § 2000e–2(h).

*CLC v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). *Weber* held that an employer does not violate Title VII by voluntarily adopting a reasonable race-conscious plan to increase minority employment, even when the plan has the effect of overriding the seniority rights of non-minorities. *See Weber*, 443 U.S. at 208–09, 99 S.Ct. at 2729–30. Given this holding, *Weber* precludes any notion that Title VII absolutely forbids voluntary action by an employer to the detriment of the seniority rights of non-minority workers. I believe that the court would have expressly addressed *Weber* had it intended to overrule that decision.[3]

### B.

The majority next holds that Colgan rebutted White's prima facie case and that White failed to prove Colgan's explanation was pretextual. Specifically, the majority states that the record lacks evidence that Colgan knew that the union referral was discriminating against Mr. White or that it ever knew that Mr. White had actually reported to the union hall for referral. The majority bases its reasoning on the fact that the union is not a party to this appeal and that it is the union to whom the consent decree is addressed. I disagree with the majority's analysis because the record does contain evidence and the district court found that Colgan itself discriminated against Mr. White. Moreover, although the consent decree was addressed to the union, it was voluntarily adopted by Colgan. Therefore, in my view, under the clearly erroneous standard of review, the district court's findings of discrimination are not clearly erroneous. Fed.R.Civ.P. 52(a).

The district court held that applying the general principles under Title VII to the facts of this case, "it is beyond peradven-

ture of a doubt that the plaintiff has established a prima facie case of discrimination against Colgan." Colgan layed off White, a minority employee, rather than reassign him to other Colgan work sites. When White requested reemployment, Colgan claimed it could rehire him only after he obtained a referral from the union hiring hall. The district court stated:

> Observed in a vacuum, such actions may well appear benign. However, when one considers the statistical and other evidence already adverted to, especially the post layoff requests for labor and concomitant work force increase, and the supposed commitment to integrate its work force as evidenced by the *Badgett* decree, it is clear that a prima facie case has been established.

The majority states that Colgan successfully rebutted White's prima facie case because "Colgan did not have knowledge that the referral system was operating in a discriminatory fashion." This holding is incorrect in two respects. First, the district court did not hold Colgan liable solely on the basis of discrimination in the referral system. As already discussed, the district court held Colgan liable for Colgan's discriminatory actions toward White. Second, I find it hard to believe that Colgan did not know that the referral system was operating in a discriminatory fashion to prevent White from rehiring. The majority is correct in stating that the only reference in the record is White's statement that he thought he had gone back to Colgan a couple of months after the layoff. However, this evidence was not rebutted. But even more important, Colgan was on notice of the discriminatory practices in the referral system by the *Badgett* suit itself. Since the burden is on defendant to rebut a prima facie case, Colgan has the burden to show either that it did not know or have reason to know of discrimination in the

---

**3.** *Stotts* did not conclude that the district court's injunction was unreasonable, but rather that it was impermissible whether it was reasonable or not. Thus, to apply *Stotts* to voluntary employ- er plans would mean that all such plans are impermissible under Title VII no matter how reasonable. This reading of *Stotts* is directly contrary to *Weber*.

referral system or that it did not know White had reported to the Union for referral.

It must be noted that a defendant rebuts a prima facie showing of discrimination only when he articulates lawful reasons for his action "which ... allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The district court stated in accordance with the law in this Circuit that where affirmative action goals have been established in a consent decree, "[n]o employment practice or seniority rule, however facially neutral, will excuse stopping or retreating." *See Brown v. Neeb*, 523 F.Supp. 1 (N.D.Ohio 1980), aff'd 644 F.2d 551 (6th Cir.1981). The district court further held that "[w]hen the defendants were so far from attaining the goals of the *Badgett* decree, Colgan had no right to layoff a minority employee...." Moreover, the district court noted that the lack of compliance with the decree alone may be deemed insufficient to negate Colgan's proffered reasons for the actions, but in conjunction it certainly is evidence of Colgan's discriminatory intent in dealing with White. Since Colgan did not articulate lawful reasons for laying off White, the district court was correct in holding that Colgan did not rebut White's prima facie case.

The interpretation of statistical analysis, motivation and intent are all questions of fact. The majority reverses the district court's finding of discrimination without determining that the court clearly erred in making its findings of fact. In my view, the district court's finding of racial discrimination in the layoff of James White was not clearly erroneous and the decision should be affirmed.

I concur with the majority on the issue of *res judicata* and would affirm the district court's decision concerning mitigation of damages.